LAW OFFICES OF BYRON THOMAS
BYRON E. THOMAS, ESQ.
Nevada Bar No. 8906
3275 S. Jones Blvd., Suite 104
Las Vegas, NV 89146
Telephone No. (702) 747-3103
Email: byronthomaslaw@gmail.com
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| ALEX GILBERT, an individual; DIANE GILBERT, an individual; <br><br> Plaintiffs, <br><br> v. <br><br> INTEGRATED FINANCIAL ASSOCIATES, INC., a Nevada corporation; KEN TEMPLETON, an individual, WILLIAM DYER, an individual; ALAN R. SMITH an individual TOWN CENTER LENDER GROUP LLC, a Nevada limited liability company; INTEGRATED MANAGERS LLC, a Nevada limited liability company; WESTERN ALLIANCE BANCORPORATION dba BANK OF NEVADA, a Delaware corporation; DOES I-X; ROES XI-XX; <br><br> Defendants. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs, ALEX GILBERT and DIANE GILBERT, by and through their attorney Byron E. Thomas, Esq., hereby complains for judgment against Defendants: INTEGRATED FINANCIAL ASSOCIATES, INC., a Nevada corporation; KEN TEMPLETON, an individual, WILLIAM DYER, an individual; ALAN SMITH, an individual; TOWN CENTER LENDING

4841-7571-1576.1

GROUP LLC, a Nevada limited liability company; INTEGRATED MANAGERS LLC, a Nevada limited liability company; WESTERN ALLIANCE BANCORPORATION dba BANK OF NEVADA, a Delaware corporation; and DOES 1-10, ROES XI-XX as follows:

## **THE PARTIES**

1. Alex Gilbert is an individual over the age of 80 residing in the State of Utah.

2. Diane Gilbert is an individual over the age of 80 residing in the State of Utah.

3. Plaintiffs allege that Defendant Integrated Financial Associates, Inc. servicer, now is, and at all relevant times was, a corporation organized and existing under the laws of the State of Nevada, and has transacted business relevant to this Action and has caused injury to Plaintiffs. IFA is not licensed to do business in the State of Utah.

4. Plaintiffs allege that Defendant Ken Templeton ("Templeton"), an individual of Clark County, Nevada, is the control person of Defendant IFA and Integrated Managers LLC, relative to this Action to the detriment and harm of Plaintiffs, he has transacted business relevant to this Action, and based upon his actions, he is joined as in his case as both a direct party and necessary and indispensable party, in the absence of which complete relief cannot be obtained.

5. Plaintiffs allege that Defendant William Dyer ("Dyer"), an individual of Clark County, Nevada, is the President of Defendant IFA and Manager of Integrated Managers LLC, relative to this Action to the detriment and harm of Plaintiffs, he has transacted business relevant to this Action, and based upon his actions, he is joined as in his case as both a direct party and necessary and indispensable party, in the absence of which complete relief cannot be obtained.

6. Plaintiffs allege that Defendant Alan R. Smith ("Smith"), a resident of Nevada County, California, has transacted business relevant to this Action to the detriment and harm of Plaintiffs, and based upon his actions, he is joined as in his case as both a direct party and necessary and indispensable party, in the absence of which complete relief cannot be obtained.

7.  Plaintiffs allege that Defendant Town Center Lender Group LLC ("Town Center"), now is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of Nevada, and has transacted business relevant to this Action and has caused injury to Plaintiffs.

8.  Plaintiffs allege that Defendant Integrated Managers LLC ("IM LLC"), now is, and at all relevant times was, a limited liability company organized and existing under the laws of the State of Nevada, and has transacted business relevant to this Action and has caused injury to Plaintiffs.

9.  Plaintiffs allege that Defendant Western Alliance Bancorporation, dba Bank of Nevada ("Bank of Nevada"), now is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware, and has transacted business relevant to this Action and has caused injury to Plaintiffs.

10. That the true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants names herein as DOES 1 through 10, and ROES 11 through 20, inclusive, are unknown to Plaintiffs at this time and Plaintiffs, therefore, sues said Defendants by such fictitious names. Plaintiffs are informed and believes and therefore alleges, that each of the Defendants designated herein as "Doe" or "Roe" are responsible in some manner for the events and happenings referred to and caused damages proximately to Plaintiffs as herein alleged. Defendants DOE or ROE are individuals, associations, corporations, partnerships, or other entities which may have in some way caused, contributed or were responsible for Plaintiffs' injuries and may have in some way caused or contributed to Plaintiffs' damages as herein alleged. The names of these Defendants are currently unknown to Plaintiffs. Therefore, Plaintiffs sue Defendants under fictitious names.

11. Plaintiff is informed and believes that IFA and IM LLC are, and at all times mentioned here were, a mere shell, instrumentality and conduit through which Templeton, and Dyer carried

- 3 -

their own activities in the corporate name, exercising such complete control and dominance over the activities of IFA and IM, LLC and   to such an extent that any individuality or separateness of said parties does not, and at all relevant times did not, exist, and to maintain the corporate form would promote fraud and injustice.

## JURISDICTION AND VENUE

12. Jurisdiction is proper pursuant to 28 U.S. Code § 1332, as there is complete diversity as to Plaintiff and Defendants.

13.  Venue is proper pursuant to 28 U.S. Code § 1391 (2).  a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in this judicial district, and the property that is the subject of the action is situated in this judicial district.

## GENERAL ALLEGATIONS

### The Unlawful Solicitation and Sale of Unregistered Securities

14. Defendants IFA, Templeton and Dyer solicited a One Million Dollar ($1,000,000.00) investment in unregistered securities across Nevada state lines from Alex and Diane Gilbert, husband and wife, who are Utah residents, and were over the age of 60 at the time.

15. Defendants IFA, Templeton, and Dyer solicited this investment in late 2007 as a fractionalized interest in a Promissory Note and Deed of Trust in a $23,100,000 loan secured in first position by real property located in Henderson, Nevada owned by Essex Real Estate Partners LLC ("Essex").  This was apparently only a sub-portion of a larger $66,000,000 loan funded with NexBank to Essex.

16.  Defendants IFA, Templeton, and Dyer needed the money and promised Plaintiffs a short-term investment of only a one-year term, with a promised return of approximately 12% per annum.

17. Defendants IFA, Templeton, and Dyer made several false and misleading statements

- 4 -

including, but not limited to:

    a.  promised Plaintiffs the interest for the entire one-year loan would be collected up front, prior to the loan closing escrow, claiming there was no risk of payment default during the one-year loan term.

    b.  promised Plaintiffs the as-is property value was well in excess of the loan amount, and sufficient to pay the entire investment back in full in the event of default.

    c.  promised Plaintiffs the loan was also secured by a substantial personal guarantee by George Holman as additional collateral which could be relied on to make payments.

18. Defendants IFA, Templeton, and Dyer required Plaintiffs to execute a Loan Servicing Agreement ("LSA"), which required these Defendants act as Plaintiffs' fiduciary to, among other things, collect and remit payments, service the loan, foreclose in the event of default, sell the property after a foreclosure, and collect on the personal guarantee.

19. Plaintiffs relied on the false and misleading promises made by these Defendants and invested $1,000,000.00.

20. Upon information and belief, Defendants IFA, Templeton, and Dyer were not registered to conduct business in Utah, and did not have a license to sell unregistered securities in Utah, making this solicitation and sale a violation of federal securities law.

21. During the solicitation, Defendants IFA, Templeton, and Dyer further concealed the following material facts from Plaintiffs:

    a.  That Defendants did not raise the full amount required to fund the loan prior to using Plaintiffs' money.

    b.  That Defendants unlawfully borrowed additional short-term funds to cover this shortfall by pledging part of the collateral in violation of the promises made to Plaintiffs.

    c.  Due to the shortfall of funds, Defendants did not set aside the $8,910,000 required

in the loan documents to secure the promise of guaranteed one-year of interest payments.

    d.  Defendants fraudulently misstated the collateral value of this investment since it was only a portion of a larger $66M loan with NexBank.

    e.  Defendants fraudulently misstated the property value since the value they presented was not "as-is", but based on millions of dollars of infrastructure improvements being installed by KB Home, which never happened.

    f.  Defendants concealed from Plaintiffs that they were allowing a loan to be secured against the property by KB Homes, making the total loans against the property over 100% of the cost.

    g.  Defendants fraudulently misstated the value of the George Holman guarantee.

    h.  Defendants fraudulently concealed and failed to disclose the amount of fees being paid to them, including an "Exit Fee".

    i.  Defendants did not disclose they entered into a Term Loan Agreement with NexBank, which terms conflicted with the LSA signed by Plaintiffs. Defendants bargained away Plaintiffs' rights under the LSA without Plaintiffs' knowledge.

22. Concealing these material adverse facts from Plaintiffs in the investment solicitation and sale across state lines also constitutes federal securities fraud.

23. If Plaintiffs would have been aware of these material adverse facts fraudulently concealed by Defendants, Plaintiffs would not have invested $1,000,000.00.

24. Defendants engaged in this false and misleading scheme to deceive Plaintiffs, and as a result Plaintiffs suffered economic loss and damages under federal securities laws.

## The IFA Corporate Fraud

25. Defendants IFA, Templeton, and Dyer solicited IFA as a financially strong company that could be relied on to conduct business with. This played an important part of Plaintiffs' decision to invest and was relied on by Plaintiffs.

26. Unbeknownst to Plaintiffs, Defendants concealed the fact they had nearly $40,000,000 in unpaid, unsecured debt securities owed to more than 100 private individuals and entities.

27. Defendants had no license to sell $40,000,000 in unsecured debt securities, and these securities were also solicited and obtained in violation of federal and state securities laws.

28. Within approximately eight months after funding, Defendants stated that the Essex loan was in default, and interest payments were not going to be remitted despite their promise of collecting one-year of interest up-front.

29. In contradiction to Defendants promises, Defendants recovered nothing for Plaintiffs as to the George Holman guarantee.

30. Defendants as fiduciaries under the LSA were expected to conduct a foreclosure and sell the property to recoup Plaintiffs' investment.  No foreclosure ever happened.

31. In contradiction of Defendants' statements, the real property value was not as described to Plaintiffs, since the infrastructure work was not even started or completed.

32. In March 2011, Defendant IFA filed for Chapter 11 bankruptcy, being represented by Defendant Alan Smith.  Defendant IFA represented it had approximately $7.5M in assets and nearly $45M in debts, which would result in negative equity of ($37,500,000).

33. On or about August 31, 2011, the Nevada Mortgage Lending Division received IFA's CPA Prepared Financial Statement for the period ended December 31, 2010, which indicated a negative equity of only ($4,995,420).

34. IFA was denied a mortgage license renewal because it was alleged it violated NRS §645B.670(a) by being insolvent, violated NRS §645B.115(i) by failing to maintain a minimum net worth, and violated NRS §645B.690(l){a} by engaging in or carrying on the business of a mortgage broker without a license.

35. IFA had no license in Nevada or any other state to solicit the almost $40,000,000 in unsecured debt securities.

36. IFA's net equity as reported in its bankruptcy appears fraudulently stated since its reported equity just three months earlier (in its report to the Nevada Mortgage Lending Division) was over $30,000,000 higher.

37. The $30,000,000 discrepancy could be due to, a) siphoning off assets just prior to the bankruptcy filing, or b) fraudulent debts being created just prior to the bankruptcy filing.

38. Attorney Candace Carlyon represented the Unsecured Creditors Committee in the IFA bankruptcy.

39. Certain members, (Mr. Fadel and Mr. Pusateri), of the borrower Essex, the company that defaulted on Plaintiffs' investment, were also unsecured creditors in IFA's bankruptcy and therefore represented by Ms. Carlyon. This dual representation and conflict was never disclosed nor was any waiver ever signed by Plaintiffs with Carlyon.

40. Another unsecured creditor represented via the unsecured creditors committee by Ms. Carlyon was Edward Erganian, who Defendants IFA, Templeton, Dyer, and Smith stated was owed $2,750,000.00 from IFA.

41. These Erganian notes were not actually real, but falsely created by Defendants while collectively engaged in fraud to control bankruptcy votes and dilute Plaintiffs' interest in the Essex collateral.

42. These falsified notes were later uncovered in another bankruptcy, filed by some of these same Defendants, in Judge Nakagawa's courtroom detailed below.

<u>Fraudulent Double and Triple Assignment of the same Collateral</u>

43. IFA reported it assigned nearly 25% of the same Essex note and deed of trust that was pledged to Plaintiffs, to Defendant Bank of Nevada under a secured loan.

44. This was never disclosed to Plaintiffs, nor did Defendants ever record an assignment in Clark County to Defendant Bank of Nevada, which is a requirement as a security instrument.

45. Upon information and belief, Bank of Nevada did not actually fund the over $5,000,000 to the escrow closing of Essex and this was a fraudulent assignment to hide assets rightfully belonging to repay Plaintiffs and others.

46. The Essex loan investment was funded on or about November 2007. Defendants Smith and Dyer represented the Bank of Nevada assignment was based on an agreement dated March 15, 2007, more than 6 months prior to the actual Essex escrow closing. Unless time runs

backwards in their world, this could not be accurate.

47. In addition, Defendant Templeton created another entity named KTSK LLC on December 10, 2010 (initials for IFA owners Ken Templeton and Steve Kalb) purporting to have a secured assignment of $3,000,000 in collateral placed in senior position to all of the $40,000,000 of unlawfully sold unsecured note securities from 100+ investors. Defendants placing themselves in a senior position after they had unlawfully raised $40,000,000 was not disclosed and a breach of fiduciary duty.

48. After the purported assignment of the Essex note (belonging to other investors including Plaintiffs), to Bank of Nevada, IFA through its President William Dyer, also executed a notarized assignment of the exact same Essex interest to Defendant Town Center Lending Group LLC on Sept 16, 2014.

49. Remarkably, Town Center Lending Group LLC ("Town Center") did not exist at that time and wasn't formed with the Nevada Secretary of State until 2 years later on August 12, 2016.  Defendants fraudulently assigned millions of dollars in collateral to an entity that didn't exist until 2 years in the future.

50. This appears to be an unauthorized fraudulent transfer to conceal assets outside of the bankruptcy court in an "unformed" entity and to hide an unrecorded fraudulent assignment. This concealment was intended to defraud Plaintiffs of collateral.

51. IFA's bankruptcy appears to have been closed two weeks later on September 1, 2016.

52. At some point, IFA's bankruptcy was reopened based upon an adversary proceeding. It was reclosed on December 12, 2017.

53. At that time, IFA was now being represented in its bankruptcy by Carlyon, who also represented Essex members Mr. Fadel, Mr. Pusateri, and even Mr. Erganian via the Unsecured Creditors Committee in the same bankruptcy, and would have had actual knowledge of the fraudulent Erganian bankruptcy notes since they were uncovered by Judge

- 9 -

Nakagawa two years earlier in October 2015.

54. All Defendants were aware Erganian notes were fraudulent, but concealed this fact from all creditors in the IFA bankruptcy and the judge, and allowed the IFA bankruptcy to be closed anyway in September 2016.

55. After Carlyon had IFA reclose its bankruptcy, two weeks later IFA recorded the Essex assignment to Defendant Town Center Lending Group LLC, as managed by Defendant IM LLC, with Defendant Dyer as manager on December 27, 2017.

56. IFA recorded this assignment to Defendant Town Center in an attempt to fraudulently transfer collateral secured with Plaintiffs' investment, to an undisclosed entity, while simultaneously "on paper" alleging this same interest was pledged to Bank of Nevada.

57. This assignment is fraudulent, and Plaintiff (including any and all actual investors) should be paid their rightfully due proceeds siphoned off with the fraudulent IFA 25% assignment.

58. Once IFA secured its 25% fraudulent assignment into Town Center Lending Group LLC, Defendants IFA, Templeton and Dyer attempted to coerce Plaintiffs to assign their interests into this same entity, so Defendants could control Plaintiffs' investment and voting rights.

59. Defendants moved investors into Town Center in an effort to secure payment to IFA, Smith, and Carlyon for unlawful management fees, expenses, legal fees, and more.  According to Nevada law, these costs can only be charged if Defendants complied with NRS 645B.356(3).

60. Any and all sections of the operating agreement must clearly and concisely state what fees will be paid and **those sections MUST be initialed by each investor**.

61. Upon information and belief, Defendants did not obtain any initials from any investors, including Plaintiffs, and therefore have no right to collect these unlawful fees and costs.

62. In addition to Defendants committing securities fraud, they are now further attempting to

unjustly enrich themselves for the fraud and wrongfully charge $3.2M in fees and expenses (also in violation of NRS 645B.356(3)).

### Defendants Created Falsified Notes to Dilute Plaintiff and Other Investors

63. Defendants Smith, Templeton, and Dyer represented in IFA's own bankruptcy that Edward Erganian held an unsecured claim of $2,750,000.

64. IFA's principal Ken Templeton also had another bankruptcy case concurrently active under the entity name "Carefree Willows LLC".[1]

65. During the Willows case, Judge Nakagawa found that the $2.7M note to Erganian was fabricated: "*Mr. Templeton testified in response to questions from Debtor's counsel that he also had conversations with Mr. Erganian that led to Mr. Erganian purchasing an obligation of the Debtor in excess of $4.6 million from an entity known as PSACP Investors, LLC ("PSACP"). Mr. Templeton also testified that in 2008 or 2009 he sold to Mr. Erganian an interest in a $500,000 promissory note made by an entity known as IFA, see note 39, infra, for the amount of $1,000. Mr. Templeton further testified that around the same time, he also sold to Mr. Erganian an interest in a $2.7 million promissory note made by IFA for the amount of $1,000.*"[2]

66. Important excerpts from the findings of Judge Nakagawa that support the misdeeds, collusion, conspiracy and fraud of Defendants include:

   a. "*Mr. Templeton also testified that Mr. Erganian had obtained many loans from a bank in which Mr. Templeton was the chairman, and that Mr. Templeton had personally loaned up to $800,000 to Mr. Erganian.*" *Id.*

   b. "*The Court found that testimony to be evasive and contradictory concerning Mr. Templeton's relationship to Ed Erganian…the Court again referenced the misleading manner in which Ken Templeton testified at the preliminary injunction hearing…It is not surprising that the Debtor would rather forget the deception attempted in Mr. Templeton's testimony at the Preliminary Injunction Hearing. See Preliminary Injunction Decision at 26:6 to 28:1. It is not surprising that the Debtor would ignore the subsequent testimony of Mr. Erganian at the Confirmation Hearing which detailed a much larger picture of deception.*"[3]

---

[1] Case 10-29932-mkn
[2] *Id*. At Doc 1451 entered October 05, 2015, footnote 6
[3] *Id.* Page 13, fn 15

c. *"Mr. Templeton had undertaken to manipulate and skew the bankruptcy voting process…contrary to the Debtor's self-pitying portrayal, some cancers thankfully are treatable, and Debtor's effort to paint itself as the victim in its own bankruptcy proceeding is not persuasive"*[4]

c. *"Debtor apparently does not quibble with the court's conclusion that the debtor in possession had attempted to manipulate the vote"* [5]

d. *"Mr. Templeton is a principal in IFA, that the Debtor's bankruptcy counsel* [Defendant Smith] *is also counsel for IFA in its bankruptcy proceeding, that Mr. Erganian purchased from Mr. Templeton or a related party two promissory notes made by IFA, and that Mr. Templeton thanked Mr. Erganian for serving on the IFA creditors committee. This is anything but the arms length, financially distinct relationship that Mr. Templeton portrayed in his testimony at the Preliminary Injunction Hearing. Compare discussion at note 6, supra. Because Willows Account cast the largest vote in favor of Debtor's Plan and against the AG Plan, the court concluded that Debtor through its principal had attempted to manipulate and skew the voting process"*. [6]

e. *"Mr. Erganian revealed, for example, that Mr. Templeton had referred Mr. Erganian to counsel representing Willows Account, that the contact with such counsel was arranged through Debtor's chief financial officer, that Debtor's chief financial officer occasionally prepares documents for Mr. Erganian, that Mr. Templeton and Mr. Erganian are actually close friends, that Mr. Erganian views Mr. Templeton as a mentor, that Mr. Templeton grants Mr. Erganian concessions on his office rent, that Mr. Templeton has forgiven thousands of dollars of interest on certain loans made to Mr. Erganian, that Mr. Templeton advised Mr. Erganian with respect to his default on certain loans issued by a bank for which Mr. Templeton was the chairperson, that Willows Account itself was formed for Mr. Erganian by the Debtor's chief financial officer, that Mr. Erganian reimbursed the Debtor's chief financial officer in cash for the cost of forming Willows Account."*

f. *"Mr. Erganian testified that Mr. Templeton had offered to arrange a sale to him of a $150,000 promissory note made by the Debtor that Mr. Templeton had personally guaranteed. Instead of purchasing that promissory note for himself, Mr. Erganian testified that he loaned funds to Timothy Deters, who is a former business partner of Mr. Erganian and who also worked for Mr. Templeton or KTRI. Mr. Deters then purchased the note in the name of his entity, Pause 1. Mr. Erganian testified that payments on the note are made to Pause 1 by Carefree Holdings, and then Pause 1 repays Mr. Erganian. He also testified that assignment of the promissory note to Pause 1 was prepared by the Debtor's chief financial officer. The proof of claim filed by Pause 1 in the bankruptcy case reflects that the original payee on the promissory note was Stanley Paher."*

---

[4] *Id*. Page 14, fn 15
[5] *Id*. Page 18, fn 23
[6] *Id*. At page 26, fn 39

- 12 -

67. Plaintiff suspects that based on this finding, there may be several other fraudulent notes that were created by Defendants, especially due to the fact that many notes were claimed to be payable to insiders.

68. The type of conduct here is repulsive and clear that Defendants have no problem being dishonest and self-dealing at the expense of innocent third parties like Plaintiffs, even to the point of creating falsified debt and security instruments to dilute collateral pledged to Plaintiffs.

69. What is more egregious is that Defendants are acting as fiduciaries to Plaintiffs, and they and their legal counsel have a duty to act in the best interests of Plaintiffs, and not engage in self-dealing and fraud.

70. The fraudulent Essex note assignments between Bank of Nevada, IFA and Town Center Lending Group should all be considered void due to their fraudulent creation.

<u>Defendants Failure to Foreclose caused Damages to Plaintiffs</u>

71. Over the next several years, Defendants engaged in a scheme to further defraud Plaintiff and other investors out of its rights to the collateral.

72. NexBank, the loan servicing company hired by Defendants, attempted to foreclose on the real property so Plaintiffs could mitigate their damages.

73. Defendants IFA, Templeton, Smith, and Dyer acted in bad faith and purposefully refused to provide the names and addresses of all investors (Plaintiff as one of them) to NexBank or the title company.

74. Without the names and addresses of all investors, the title company refused to conduct a foreclosure since it could not provide proper legal notice to all interested parties.

75. Defendants were aware or should have known that NRS 106.240 requires a foreclosure occur within 10 years in Nevada, or the note is considered satisfied and discharged.

NRS 106.240 Extinguishment of lien created by mortgage or deed of trust upon real property. The lien heretofore or hereafter created of any mortgage or deed of trust upon any real property, appearing of record, and not otherwise satisfied and discharged of record, shall at the expiration of 10 years after the debt secured by the mortgage or deed of trust according to the terms thereof or any recorded written

- 13 -

extension thereof become wholly due, terminate, and it shall be conclusively presumed that the debt has been regularly satisfied and the lien discharged.

76. The Note became due in December 2008, and Defendants breached their fiduciary duties and failed to protect Plaintiffs' interest in the collateral by failing to foreclose by December 2018.

77. The foreclosure would have occurred if not for Defendants bad faith acts, gross negligence and failure to provide names and address for proper foreclosure notices.

78. Defendants actions caused serious and irreparable harm by legally risking loss of the real property collateral assigned to pay back Plaintiffs.

79. Essex, the company that owned the property, ultimately filed for Chapter 11 bankruptcy due to Defendants failure to enact a foreclosure.

80. Due to Defendants failures, Defendants agreed to pay Essex, the borrower, $18.7M in sale proceeds that should have been assigned to Plaintiffs and IFA's other investors.

81. Defendants further deceived Plaintiffs of the agreement to pay the borrower $18.7M, by sending out a vote for Plaintiffs' approval *after* they had already agreed to it days earlier.

82. Bank of Nevada now claims it is not due any of the proceeds, and was not collecting on the 25% "paper assignment" Defendants previously alleged was true. Defendants concealed this and unlawfully took 25% of the proceeds for personal gain, rightfully due to Plaintiffs.

83. Plaintiffs were significantly harmed due to Defendants failure to foreclose. Plaintiff was damaged and is owed $1,000,000.00 plus default interest for over 14 years.

84. Defendants only collected and paid approximately 30-35% of Plaintiffs' principal back, and is now demanding Plaintiffs pay Defendants' attorney fees, costs, expenses, and management fees, even after their failure to foreclose was the proximate cause of Plaintiffs' loss and damages.

85. This is completely unconscionable and Defendants have no basis in which to charge Plaintiffs for their failures and fraud.

Defendants Engaged in Further Conduct to Defraud Plaintiffs

86. Previously unknown to Plaintiffs, after Defendants failed to foreclose, Defendants

- 14 -

attempted to purchase the "Essex" majority ownership for their own personal gain, and at the detriment of Plaintiff and all of IFA's investors.

87.  Defendant Dyer spoke with Mr. Holman, the purported guarantor to Plaintiff's investment about buying his membership interest without the knowledge of Plaintiff and other investors.

88. Defendants Dyer, Templeton, Smith and their legal counsel were all aware of NRS 106.240 and the impact it had on Plaintiffs' collateral rights.

89. To further their own personal agendas, Defendant Smith, at the direction of Defendants IFA, Templeton, and Dyer sent correspondence to Mr. Holman in November 2019 stating:

    a.  Defendants would create a new entity and pay Mr. Holman $3,000,000.  The same Mr. Holman who Defendants claimed guaranteed Plaintiffs' investment.

    b.  Defendants would declare the Note and Deed unenforceable, thereby wiping out any chance of recovery of Plaintiffs and all other investors.

    c.  Defendants would pay the borrower Essex $1,000,000 to disburse to its members. The same Essex company that owed Plaintiffs $1,000,000 plus 14 years of default interest.

    d.  Defendants would then walk away after selling the real property with all proceeds personally pocketed, estimated at over $45M, and Plaintiff and other investors would receive nothing.

90. Defendants concealed this offer from Plaintiffs to engage in civil conspiracy to defraud Plaintiffs and enrich themselves.

91. If Defendants would have succeeded in their scheme, Plaintiff would have had a complete and total loss.

92. Defendants purposefully, maliciously and willfully breached their fiduciary duties by not foreclosing just to engage in this scheme for their own personal benefit and gain.

93. Defendants were engaged as fiduciaries to work for Plaintiffs' best interests.

94. Defendants breached those duties and engaged in unlawful conduct to promote their own interests and to purposefully harm Plaintiffs.

- 15 -

Defendants Further Violated Their Duties and Concealed Information

95. Surprisingly, Defendants IFA via legal counsel Carlyon sent out correspondence on January 25, 2021 requesting votes from Plaintiffs to approve the Essex reorganization plan and settlement.

96. Defendants IFA, Templeton, and Dyer fraudulently concealed the fact that the reorganization plan was already approved 10 days earlier.

97. That correspondence was fraudulent for a number of reasons:

a. IFA states it will be deducting $3.2M in unauthorized expenses and legal fees despite their fraud, malfeasance, and breaches.

a. Carlyon previously stated in a meeting with Mr. David Weeks in February 2020 that she represented all of the individual investors (including Plaintiffs). Later, she recanted in Court and claimed not to represent Plaintiffs, but is still attempting to charge Plaintiffs the legal fees of Defendants IFA, Smith, Templeton, Town Center, and Dyer.

b. Smith and Carlyon have stated in correspondence that Plaintiffs must pay for legal fees related to a bankruptcy adversary complaint. Interestingly, Plaintiffs and Defendant IFA is not involved in any adversary complaint. This complaint is brought improperly by third-party strawmen of Defendants, and now Plaintiffs are being unlawfully forced to pay for this fraud upon the court.

c. Defendants represented Plaintiffs and their interests as fiduciaries. Defendant IFA through Carlyon sent Plaintiffs correspondence that if they will not sign a full and complete release of all known or unknown claims, Defendants will sue Plaintiffs. This is oppressive, malicious, and abuse against elderly persons.

d. Defendants falsely stated the vote ballot indicates that if you do not respond and sign it, you are bound anyway and it is deemed your automatic approval. Parties cannot be held legally liable to a written document they refuse to sign. Defendants know this type of oppressive behavior is coercive and not legally binding.

98. It certainly appears IFA is deducting over $3.2M in unauthorized costs, as well as taking

- 16 -

25% of the net proceeds through the fraudulent IFA/Bank of Nevada transfer to Town Center Lending Group kept secret, resulting in a windfall to IFA of over $5,000,000.00 at the expense of Plaintiffs, the real investors and retirees who are now being told they will receive only 30-35% of their original investment back.

99. Plaintiff has been harmed by the oppressive and malicious actions by Defendants including but not limited to:

**FIRST CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty)**

100.    Plaintiffs repeat, re-allege and incorporate by reference all preceding paragraphs of the Complaint as though fully set-forth herein.

101.    Defendants IFA, Templeton, and Dyer caused Plaintiffs to enter into the LSA. Therefore, IFA, Templeton and Dyer were fiduciaries of Plaintiffs, entrusted to protect their investment and act in good faith for Plaintiffs' best interests. Smith was employed by these Defendants to protect this fiduciary duty to Plaintiffs.

102.    Defendants IFA, Templeton, Smith and Dyer, breached their fiduciary duty to Plaintiffs by failing to disclose material information such as that the foreclosure had not occurred in a timely fashion, that they placed themselves in a senior position to receive distributions ahead of Plaintiffs, improperly charged Plaintiffs for fees and costs, and taking advantage of Plaintiffs due to their advanced years of Plaintiffs.

103.    As a direct and proximate cause of Defendants IFA, Templeton, Smith and Dyer, Plaintiffs suffered damages in excess of $75,000.

104.    Plaintiff had to retain the services of an attorney because of the actions of Defendants IFA, Templeton, Smith and Dyer and therefore they are entitled to reasonable attorney fees and costs.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract)**

105.    Plaintiffs repeat, re-allege and incorporate by reference all preceding paragraphs of

- 17 -

the Complaint as though fully set-forth herein.

106.    The LSA between Plaintiffs, IFA, Templeton and Dyer was a valid and enforceable agreement.

107.    IFA, Templeton and Dyer breached the terms and conditions of the LSA by failing to make the required disclosures under the LSA as to their senior position, fraudulently pledging collateral to themselves, improperly charging fees and costs and failing to protect the property as required by the LSA.

108.    As a direct and proximate cause of Defendants IFA, Templeton and Dyer, Plaintiffs suffered damages in excess of $75,000.

109.    Plaintiff had to retain the services of an attorney because of the actions of Defendants IFA, Templeton and Dyer, therefore they are entitled to reasonable attorney fees and costs.

### THIRD CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

110.    Plaintiffs repeat, re-allege and incorporate by reference all preceding paragraphs of the Complaint as though fully set-forth herein.

111.    In every contract there is an implied covenant of good faith and fair dealing, and the parties will not attempt to deprive each other of the benefit of their bargain.

112.    Defendants IFA, Templeton, Dyer and Plaintiff had a special relationship, because IFA, Templeton and Dyer were fiduciaries of Plaintiffs.

113.    Despite the special relationship and the duty of good faith and fair dealing IFA, Templeton and Dyer attempted to deny Plaintiff the benefit of the parties agreement by failing to make the required disclosure under the LSA as to their senior position, fraudulently pledging collateral to themselves, improperly charging fees and costs, failing to protect the property as required by the LSA, and attempting to take advantage of Plaintiffs advanced years of Plaintiffs.

- 18 -

114.      As a direct and proximate cause of Defendants IFA, Templeton and Dyer, Plaintiffs suffered damages in excess of $75,000.

115.      Plaintiffs had to retain the services of an attorney because of the actions of Defendants IFA, Templeton and Dyer, therefore they are entitled to reasonable attorney fees and costs.

**FOURTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

116.      Plaintiffs repeat, re-allege and incorporate by reference all preceding paragraphs of the Complaint as though fully set-forth herein.

117.      Plaintiffs had an expected to benefit from their investment.  Defendants IFA, Templeton, Smith and Dyer usurped and denied Plaintiffs the benefit of that bargain by entering into secret and wrongful agreements with Defendants Town Center, IM LLC, and Bank of Nevada, and assessing improper fees and costs against Plaintiffs.  Thus, Defendants IFA, Templeton, Smith and Dyer have taken the benefit meant for Plaintiffs and conferring it upon themselves and Defendants Town Center, IM LLC and Bank of Nevada.

118.      It would be unjust to allow Defendants IFA, Templeton, Smith, Dyer, Town Center, IM LLC and Bank of Nevada to retain those benefits.

119.       As a direct and proximate cause of Defendants IFA, Templeton, Smith, Dyer, Town Center, IM LLC and Bank of Nevada actions Plaintiffs have suffered damages in excess of $75,000.

120.      Plaintiffs had to retain the services of an attorney because of the actions of Defendants IFA, Templeton, Smith, Dyer, Town Center, IM LLC and Bank of Nevada therefore is entitled to reasonable attorney fees and costs.

**FIFTH CLAIM FOR RELIEF**
**(Civil Conspiracy)**

121.      Plaintiff repeats, re-alleges and incorporate by reference all preceding paragraphs of the Complaint as though fully set-forth herein.

- 19 -

122.     Defendants and each of them conspired and intended to commit illegal acts as described above, against Plaintiffs.

123.     Defendants took substantial steps towards carrying out their conspiracy, and actually committed their intended unlawful acts, by making fraudulent misrepresentations to Plaintiffs and creating fraudulent assignments.

124.     Defendants actions as averred in this claim for relief were done either in conscious disregard for the rights of Plaintiffs, or in reckless disregard of the consequences of their actions, and were therefore done with either express or implied malice.

125.     Defendants' actions were the direct and proximate cause of Plaintiff's injuries, which are in excess of $75,000.

126.     Plaintiffs have been required to retain the services of an attorney to prosecute this matter and therefore, is entitled to an award of reasonable attorney's fees and costs incurred herein.

**SIXTH CLAIM FOR RELIEF**
**(BREACH OF NRS 645B.356(3))**

127.     Plaintiffs repeat, re-allege and incorporate by reference all preceding paragraphs of the Complaint as though fully set-forth herein.

128.     NRS 645B.356(3) regulates the method and manner upon which Defendants IFA, Templeton, Smith and Dyer could assess fees and costs against Plaintiffs.

129.     Defendants IFA, Templeton, Smith and Dyer failed to make the necessary disclosures and obtain the necessary permissions as required by NRS 645B.356.

130.     Defendants IFA, Templeton, Smith and Dyer are continuing to act in a manner that violates NRS 645B.356.

131.     Plaintiffs are in the class of person meant to be protected by NRS 645B.356, and Defendants IFA, Templeton, Smith and Dyer knew or should have known of the

applicability of NRS 645B.356 at all times.

132.     As a direct and proximate cause of Defendants IFA, Templeton, Smith and Dyer actions Plaintiffs have suffered damages in excess of $75,000.

133.     Plaintiff had to retain the services of an attorney because of the actions of Defendants IFA, Templeton, Smith and Dyer and therefore Plaintiffs are entitled to reasonable attorney fees and costs.

## SIXTH CLAIM FOR RELIEF
### (BREACH OF NRS 41.1395)

134.     Plaintiffs repeat, re-allege and incorporate by reference all preceding paragraphs of the Complaint as though fully set-forth herein.

135.     Plaintiffs lost their investment, which constitutes a loss of money or property caused by exploitation of Defendants.

136.     Defendants obtained the money by committing acts of fraud upon the Plaintiffs as identified in the proceeding paragraphs.

137.     At all relevant times Plaintiffs were over the age of 60 and Defendants were aware that they were over the age of 60.

138.     Plaintiff are in the class of person meant to be protected by NRS 41.1395, and Defendants knew or should have known of the applicability of NRS 41.1395 at all times.

139.     As a direct and proximate cause of Defendants actions Plaintiffs have suffered damages in excess of $75,000.

140.     Plaintiff had to retain the services of an attorney because of the actions of Defendants   and therefore Plaintiffs are entitled to reasonable attorney fees and costs.

- 21 -

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1. Enter judgment against each Defendant in favor of each Plaintiff, in an amount to be determined by the Court, for compensatory damages as a result of the injuries Plaintiffs have suffered due to Defendants tortious acts, in an amount to be determined;

2. Enter judgment against Defendants in favor of each Plaintiff for punitive damages because Defendant's acts were intentional, malicious, and performed deliberately to injure, damage, and harm each Plaintiff, in an amount to be determined;

3. Enter judgment against Defendants for Plaintiffs' costs, expenses, attorney's fees, and such other relief as this Court finds just and equitable; and

4. Award all such other relief the Court deems just and proper.


Dated this _24_<sup>th</sup> Day of December 2021

LAW OFFICES OF BYRON THOMAS


By: /s/ BYRON E. THOMAS, ESQ.
BYRON THOMAS
3275 S. Jones Blvd
Las Vegas, Nevada 89146
Phone: (702) 747-3103
Attorneys for Debtor,